UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

KEVIN J. POST,                    )
                                  )
              Plaintiff,          )        Case No. 1:10-cv-271
                                  )
v.                                )        Honorable Paul L. Maloney
                                  )
COMMISSIONER OF                   )
SOCIAL SECURITY,                  )
                                  )        __REPORT AND RECOMMENDATION__
              Defendant.          )
_____)

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking

review of a final decision of the Commissioner of Social Security denying plaintiff's claims for

disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On December

12, 2006, plaintiff filed his applications for benefits alleging an October 30, 2000 onset of disability.[1]

(A.R. 147-54).  Plaintiff's claims for DIB and SSI benefits were denied on initial review.  (A.R. 109-

17).  On June 11, 2009, he received a hearing before an administrative law judge (ALJ), at which

he was represented by counsel.  (A.R. 25-106).  On September 24, 2009, the ALJ issued a decision

---

[1]Plaintiff has not contested the administrative finding that he performed substantial gainful
activity through December 2006.  Accordingly, plaintiff is not eligible to receive benefits for any
period before January 2006.  20 C.F.R. §§ 404.1571, 416.971.
        SSI benefits are not awarded retroactively for months prior to the application for benefits.
20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also
Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in
which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus,
January 2007 is his earliest possible entitlement to SSI benefits.

finding that plaintiff was not disabled.  (A.R. 13-20).  On March 1, 2010, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

On March 17, 2010, plaintiff filed his complaint seeking judicial review of the Commissioner's decision denying his claims for DIB and SSI benefits.  Plaintiff argues that the court should overturn the Commissioner's decision on the following grounds:

1.     The ALJ's findings that plaintiff did not meet or equal the requirements of listings 1.04(A) and 12.05(C) are not supported by substantial evidence;

2.     The ALJ "failed to properly determine that claimant's mental impairment was a severe impairment and failed to factor the claimant's mental impairment into the RFC assessment;" and

3.     "The ALJ did not meet his burden at step five because he failed to pose a hypothetical question to the vocational expert that included his residual functional capacity assessment restricting the claimant to eye level work while seated."

(Statement of Errors, Plf. Brief at 1-2, docket # 8).  Upon review, I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision.  I recommend that the Commissioner's decision be affirmed.

### Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).

The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from October 30, 2000, through the date of the ALJ's decision. (A.R. 15). Plaintiff

was not disabled at any time before January 2006, because he had engaged in substantial gainful activity through December 2005. (A.R. 15). *See* 20 C.F.R. §§ 404.1571, 416.971. Plaintiff had not engaged in substantial gainful activity on or after January 1, 2006. (A.R. 15). Plaintiff had the following severe impairments: "lumbar/cervical degenerative disc disease." (A.R. 15). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 16). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except avoid repetitive bending and twisting of his neck and low back, no prolonged flexed posture of the cervical spine, work at eye level while in a seated position, no prolonged sitting, standing, walking, stooping, or driving for more than 30 minutes at a time, change pace or a few minutes break, and no lifting more than 20 pounds at one time.

(A.R. 17). The ALJ found that plaintiff's testimony regarding his subjective limitations was not fully credible:

> After careful consideration of the evidence, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> Notwithstanding claimant's surgery and physical therapy, the medical record does not support his alleged limitations. In January 2001, he reported that some days his shoulder bothered him "very little" (Ex 1F/17)[A.R. 267]. Regarding his return to work status, it was reported in May 2001 that claimant could work one-handed and resume regular work in three months. On October 1, 2001, claimant was discharged from physical therapy with right upper extremity range of motion within normal limits. The right shoulder was normal in flexion, abduction, internal and external rotation. Cervical range of motion was limited to approximately 80 percent of normal range of motion in extension. His strength was restored to 5/5. He was pain-free to manual muscle testing.
>
> Claimant tolerated treatment very well and made significant gains throughout his shoulder girdle (Ex 1F/35)[A.R. 283]. In January 2002, claimant reported onset of leg pain, but he was noted to sit in no distress, independently sit-to-stand, and ambulated with stable gait.

Extension of low back was pain free.  Lateral bending was pain free.  Tinel's and Phalen's were negative (Ex 1F/48/49)[A.R. 295-96].  The August 2002 cervical spine MRI offered no significant changes or explanation for claimant's bilateral arm and leg symptoms (Ex 6F/17)[A.R. 374].

In April 2007, claimant told the evaluating consultant that he was off work for three years on Workers' Compensation and then got a settlement.  He was taking Advil for symptoms.  He reported he was driving, independent in activities of daily living, self-dresses, prepares meals, walks where he needs to go, climbs a flight of stairs, lifts a gallon of milk without difficulty.  Claimant also reported that he had a five-pound weight restriction.  He worked one month in May 2006 installing racks overhead with nuts and bolts.  The job ended because they ran out of work.  Upon physical examination, there was no evidence of joint laxity, crepitus, or effusion.  Jamar testing showed 115 pounds compression on the right and 110 pounds compression on the left.  Dexterity was unimpaired.  Back is nontender to palpation.  He complained of lumbar pain with motion and bilateral knee extension and bilateral hip forward flexion but had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting and arising, no difficulty balancing, and no difficulty hopping.  He could [perform] dorsolumbar spine flexion to 60 degrees with back pain.  He complained of pain with straight leg raise in seated position and supine position.  No loss of sensation or motor strength was appreciated.  Extremity reflexes are 2+ on the right and on the left (Ex 8F)[A.R. 384-89].

In February 2007, claimant reported that he reads a lot, takes showers, tries "to look for work," watches television, and cleans the apartment.  He dresses, bathes, cares for hair, shaves, feeds self, and toilets without assistance.  He cooks, plays cards and video games.  He walks two miles.  He pays attention as long as needed.  He follows written instructions, handles stress, and changes in routine well (Ex 4E)[A.R. 204-12].  Claimant's activities are rather varied and full and not consistent with a finding of disability.

The medical evidence of record supports claimant's assertion that he has physical limitations.  However, the undersigned finds claimant's limitations are no greater than the restrictions from his treating physician.  In March 2005, Dr. Kidwai advised claimant to avoid repetitive bending and twisting of the neck and low back; no prolonged flexed posture of the cervical spine; keep computer or television at eye level; no prolonged sitting, standing, walking, stooping, or driving for more than 30 minutes at a time; change pace or take short breaks after each period of activity; and no lifting over 20 pounds (Ex 4F/14/15)[A.R. 348-49].  The undersigned gives significant weight to Dr. Kidwai's restriction of activities which serves as the basis for the established residual functional capacity.  It is important to note that State agency physician, Dr. Tanna's physical assessment in May 2007 (Ex 14F)[A.R. 399-405] is within the perimeter of Exhibit 4F.

(A.R. 17-18).  Plaintiff was unable to perform his past relevant work.  (A.R. 18).  Plaintiff was 36 years old as of the date of his alleged onset of disability and 45 years old as of the date of the ALJ's

decision.  Thus, at all times relevant to his claims for DIB and SSI benefits, plaintiff was classified as a younger individual.  (A.R. 19).  Plaintiff has a high school education and is able to communicate in English.  (A.R. 19).  The transferability of job skills was not material to a disability determination.  (A.R. 19).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with his RFC, education, and work experience, the VE testified that there were approximately 13,200 jobs in the State of Michigan that the hypothetical person would be capable of performing.  (A.R. 95-103).  The ALJ found that this constituted a significant number of jobs.  Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (A.R. 19-20).

## 1.

Plaintiff argues that the ALJ's step-3 findings[2] that he did not meet or equal the requirements of listing 1.04(A) (disorders of the spine) and listing 12.05(C) (mental retardation) are not supported by substantial evidence.  (Plf. Brief at 7-10; Reply Brief at 2-3).  Step-3 regulates a "narrow category of adjudicatory conduct."  *Combs v. Commissioner*, 459 F.3d 640, 649 (6th Cir.

---

[2]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act."  *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity.  Next, the claimant must demonstrate that []he has a 'severe impairment.'  A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past.  Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work."  *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009); *see Lindsley v. Commissioner*, 560 F.3d 601, 602-03 (6th Cir. 2009).

2006) (*en banc*).  It "governs the organization and evaluation of proof of listed impairments that, if supported, renders entitlement to benefits a foregone conclusion."  *Id.*  "Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the [Social Security Administration's] SSA's special list of impairments, or that is at least equal in severity to those listed.  The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity.  A person with such an impairment or an equivalent, consequently, necessarily satisfies that statutory definition of disability."  *Id.* at 643 (internal citations omitted).

It is well established that a claimant has the burden of demonstrating that he satisfies all the individual requirements of a listing.  *See Elam*, 348 F.3d at 125; *see also Perschka v. Commissioner*, 411 F. App'x 781, 786-87 (6th Cir. 2010).  "If all the requirements of the listing are not present, the claimant does not satisfy that listing."  *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002).  An impairment satisfies a listing only when it manifests the specific findings described in the medical criteria for that particular impairment.  *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1525(c), 416.925(c); *see also Lusk v. Commissioner*, 106 F. App'x 405, 411 (6th Cir. 2004) ("Substantial evidence exists to support a finding that the claimant does *not* meet the listing if there is a lack of evidence indicating the existence of all of the requirements of a listed impairment.").  "It is insufficient that a claimant comes close to satisfying the requirements of a listed impairment."  *Elam*, 348 F.3d at 125.  It is possible for a claimant to provide evidence of a medical equivalent to a listing.  20 C.F.R. §§ 404.1526, 416.926.  "To demonstrate such a medical equivalent, the claimant must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Bailey v. Commissioner*, 413 F. App'x 853, 854 (6th Cir. 2011) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)); *Thacker v. Social Security Admin.*, 93 F. App'x

725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

    A.    <u>Listing 1.04(A)</u>

    Listing 1.04(A) for disorders of the spine contains the following requirements:

1.04    Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

    A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).  A mere report of atrophy is not acceptable evidence of motor loss:

[A] report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs, or both upper and lower arms, as appropriate, at a stated point above and below the knee or elbow given in inches or centimeters.  Additionally, a report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(e)(1); *see Simon v. Commissioner*, No. 1: 06-cv-712, 2008 WL 68954, at * 3 n.2 (W.D. Mich. Jan. 4, 2008).  "[I]nability to walk on the heels of toes, to squat, or arise from a squatting position, when appropriate, may be considered as evidence of significant motor loss."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(e)(1); *see Molnar v. Astrue*, 395 F. App'x 282, 287 (7th Cir. 2010).

The ALJ found that plaintiff did not meet or equal the requirements of any listed impairment. (A.R. 16). "[N]o acceptable medical source ha[d] referenced findings equivalent in severity to the criteria of any listed impairment." (A.R. 16). The ALJ found: "There is nothing to suggest continued major dysfunction of a major peripheral weight-bearing joint, such as knees, that has resulted in inability to ambulate effectively as defined in 1.00B2b. Although the claimant denies having the ability to walk or stand for extended periods, the evidence that is discussed more fully below does not establish that the claimant is unable to ambulate effectively. Therefore the claimant's impairments do not meet or medically equal the severity described in Listings 1.02 and 1.04.[3]" (A.R. 16).

The majority of the medical records plaintiff presented in support of his claims for DIB and SSI benefits are dated before January 1, 2006. (A.R. 252-334, 363-67, 374-81, 435-53, 467-87). Plaintiff performed substantial gainful activity through December 2005 and cannot be found disabled before January 1, 2006. *See* 20 C.F.R. §§ 404.1571, 416.971.

On March 29, 2005, plaintiff reported to Farook J. Kidwai, M.D., that he had settled his worker's compensation claim, got bored, and went back to work. He stated that his new job as a warehouse shipping receiver was "quite manually demanding." (A.R. 346). He stated that he was finding it more difficult to "maintain his chores both at home and at work." (A.R. 346). Plaintiff stated that he experienced pain in his neck and lower back and that he took over-the-counter Advil for pain relief. (A.R. 346-47). Plaintiff's deep tendon reflexes in his upper extremities were

---

[3]Plaintiff's argument that the ALJ "never really considered Listing 1.04A" (Plf. Brief at 8) is patently meritless. The ALJ gave "particular consideration" to plaintiff's musculoskeletal complaints. (A.R. 16). He found that plaintiff did not meet or equal listing 1.04, which includes subsection A. (A.R. 16).

symmetrical and brisk.  (A.R. 348).  Dr. Farook found that plaintiff had paraspinal muscle spasms in his cervical and lumbar regions resulting in "some restriction of mobility." (A.R. 348).  The level of restriction and plaintiff's amenability to treatment with muscle relaxants and physical therapy were not addressed.  Dr. Farook wrote: "C7 sensory/motor deficits are rather apparent, more on the right, though contribution from pain cannot be excluded with certainty . . .  Mild sensory/motor deficits are apparent along the L5-S1 distribution on either side.  Once again, contribution from pain cannot be excluded with certainty." (A.R. 348).  Dr. Farook did not find that plaintiff's impairments prevented him from working.  He found that for an eight-week period plaintiff would require the work restrictions of no lifting over 20 pounds, no prolonged sitting, standing, walking, or driving for more than thirty minutes at a time.  The doctor cautioned against prolonged flexed posture of the neck and suggested keeping any computer at eye level and taking breaks of a few minutes after each period of activity.  Plaintiff was advised to avoid frequent bending and twisting of his lower back and neck and/or shoulder girdle.  (A.R. 337, 348-49).

Plaintiff's April 2005 x-rays indicated degenerative disc disease at C6-7 with "mild" spondylosis.  There was a possible narrowing of the right C3-4 and C4-5 foramen, but otherwise his cervical spine appeared normal.  (A.R. 368).  X-rays of his lumbar spine revealed moderately advanced degenerative disc disease at L5-S1, but "otherwise appeare[ed] normal." (A.R. 369).  The April 2005 MRI of his cervical spine indicated posterior degenerative spurs at C6-7 and right foraminal narrowing at C3-4.  (A.R. 370).  The lumbar spine MRI indicated degenerative disc disease at L5-S1. (A.R. 371).  The report noted, "Posterior degenerative spurs could come in contact with the right S1 rootlet as it crosses the L5-S1 disc space.  Correlation with this finding [was] recommended." (A.R. 371).  "The lumbar spine otherwise appear[ed] normal." (A.R. 371).

On April 11, 2005, Val D. Srying, D.O, conducted an EMG/NCT study which returned essentially normal results:

> I performed a detailed EMG/NCT study on the patient's right arm and left leg, looking for electrical evidence of a nerve entrapment syndrome, polyneuropathy or radiculopathy.
>
> An NCT study of the patient's right upper extremity demonstrated very minimal slowing of the ulnar conduction around the elbow but no other significant abnormalities. An NCT study of the right leg was well within normal limits. An EMG of the right arm failed to demonstrate any clear-cut electrical evidence of an acute or chronic cervical spine nerve root injury. Interference patterns are thought to be full. An EMG of the left leg revealed no electrical evidence of an active or significant chronic lumbar radiculopathy. Again. Interference patterns seem full.

(A.R. 343). Dr. Srying found a "very minimal slowing of ulnar conduction around the elbow at 48 meters a second with normal being equal to or greater than 50 meters a second." (A.R. 343). The EMG of plaintiff's right arm and left leg were normal. There was no evidence of radiculopathy. (A.R. 343).

On July 27, 2005, plaintiff's treating physician, Scott Duemler, M.D., reported that plaintiff had normal reflexes, sensation, strength, and muscle tone. (A.R. 441). Plaintiff stopped working in December 2005. He did not provide any medical records for the year 2006.

On January 15, 2007, plaintiff underwent outpatient surgery for testicular cancer. (A.R. 427-28). On March 5, 2007, Paul Rodriguez, M.D., stated that plaintiff had "recovered nicely" from his surgery. (A.R. 411).

On April 18, 2007, plaintiff received a consultative examination conducted by Tama Abel, M.D. Plaintiff reported that he took Advil for pain relief. (A.R. 384). He was independent in his activities of daily living. He was able to prepare meals and do housework. (A.R. 384). Dr. Abel found no evidence of joint laxity, crepitus, or effusion. Plaintiff's grip strength was 115 pounds on the right and 110 pounds on the left. His dexterity was unimpaired. His range of motion was

-11-

normal in all areas measured, with the exception of dorsolumbar spine flexion.  (A.R. 386).  Plaintiff

had no difficulty getting on and off the examination table, no difficulty heel and toe walking, and

no difficulty squatting, balancing and hopping.  (A.R. 387).  Neurologically, plaintiff's cranial nerves

were intact.  His motor strength and tone were normal.  His reflexes were intact and symmetrical.

(A.R. 388).  Plaintiff walked with a normal gait and did not require an assistive device.  (A.R. 388).

There is no medical evidence for the year 2008.  On May 8, 2009, Dr. Duemler found

that plaintiff had normal reflexes, sensation, strength, and muscle tone.  (A.R. 415, 441).

Plaintiff did not carry his burden of providing medical evidence establishing the

motor loss and sensory loss required by listing 1.04(A).  Dr. Kidwai's March 2005 report of atrophy

does not suffice under the regulations, because it was not acceptable evidence of motor loss.  Dr.

Kidwai did not provide the circumferential measurements required by the listing.  20 C.F.R. Pt. 404,

Subpt P, App. 1 § 1.00(e)(1); *see Lawson v. Commissioner*, 192 F. App'x 521, 529-30 (6th Cir.

2006); *see also Hernandez v. Commissioner*, 198 F. App'x 230, 234-35 (3d Cir. 2006); *Candelario

v. Barnhart*, 166 F. App'x 379, 382-84 (10th Cir. 2006).  Further, plaintiff's EMG returned normal

results, his reflexes were symmetrical and intact, and his muscle strength and tone were normal.  The

ALJ's finding that plaintiff did not meet or equal the requirements of listing 1.04(A) is supported

by more than substantial evidence.

B.     Listing 12.05(C)

Plaintiff argues that the ALJ erred when he found that plaintiff did not meet or equal

the requirements of listing 12.05(C).  (Plf. Brief at 9-10).  "The structure of listings for mental

retardation is different from that of the other mental disorders listings.  Listing 12.05 contains an

introductory paragraph with the diagnostic description for mental retardation.  It also contains four

sets of criteria (paragraphs A through D)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A).  A

claimant will not be found disabled under the listing for mental retardation unless he satisfies the

diagnostic description in the introductory paragraph and one of the additional sets of criteria found

in paragraphs A through D.  *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see Cheatum*

*v. Astrue*, 388 F. App'x 574, 576 (8th Cir. 2010); *Randall v. Astrue*, 570 F.3d 651, 659-60 (5th Cir.

2009).

The diagnostic description component of listing 12.05 contains these specific

requirements:

> 12.05  Mental Retardation: Mental retardation refers to a significantly subaverage general
> intellectual functioning with deficits in adaptive behavior initially manifested during the
> developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment
> before age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  The part C severity component contains additional

requirements:  "A valid verbal, performance or full scale IQ of 60 through 70 and a physical or other

mental impairment imposing an additional and significant work-related limitation of function."  20

C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

Plaintiff presented remarkably little evidence suggesting that he suffered from a

disabling mental impairment.  The administrative record is devoid of evidence establishing that

plaintiff experienced any deficits of adaptive functioning consistent with metal retardation before

age 22.  Plaintiff reached age 22 on June 20, 1986.

In late 1979, plaintiff, then age 14, was associating with "an older antisocial and

substance abusing peer group."  (A.R. 472, 483).  He gave a history which included drug use,

primarily cannabis. (A.R. 467, 476).  He had become increasingly aggressive and assaultive, refused

to follow his mother's rules, and would not attend school.  (A.R. 472).  His interest in school had

been declining for about a year.  He was attending school only one or two hours per day and was very apathetic.  He was spending his time "drinking with [his] older friends."[4]  (A.R. 472).  There was no evidence of any psychotic thought disorder.  His general cognitive functioning was intact with appropriate recall and concentration. (A.R. 473).  He  was diagnosed with an "adjustment reaction to adolescence."  (A.R. 467-87).   He received a psychological evaluation to assess his cortical/cognitive functioning in an effort to determine whether he had any learning disability or neurological disease.  Plaintiff achieved the following test results:  a verbal IQ of 95, a performance IQ of 91, and a full scale IQ of 92.  Plaintiff fell within the normal range of intellectual functioning. (A.R. 467, 470).  He did not require a special education program. (A.R. 471).  Neuropsychology tests resulted in scores in the "borderline" range for cortical functioning.  (A.R. 468).  Plaintiff did not require neurolological intervention.  (A.R. 469).  For purposes of academic planning, it appeared that plaintiff had a learning disability in the visual-perceptual sphere resulting in difficulty organizing complex patterns of stimuli.  (A.R. 469).  Plaintiff testified that he attended special education classes (A.R. 30), but it is well established that placement in a special classroom falls short of establishing significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested before age 22.  *See Foster v. Halter*, 279 F.3d at 352;  *McLeichy v. Commissioner*, No. 1:09-cv-857, 2010 WL 3852318, at * 2 (W.D. Mich. Sept. 29, 2010); *Disette v. Commissioner*, No. 1:09-cv-1335, 2010 WL 2925998, at * 5 (N.D. Ohio July 23, 2010).  The school records plaintiff submitted in support of his claims for DIB and SSI benefits document his marginal effort and sporadic attendance.  (A.R. 464-65, 488-91).  The Sixth Circuit "has never held that poor academic

_____

[4]Plaintiff testified that he was convicted of drunk driving in 1997.  (A.R. 70-71).

performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes v. Commissioner*, 357 F. App'x 672, 677 (6th Cir. 2009).

Plaintiff testified that he obtained a GED (A.R. 30) and that he had experienced difficulty concentrating in school. (A.R. 32). Plaintiff gave the following testimony regarding his reading habits:

Q       Okay. Do you ever read at all?

A       Yes Sir.

Q       What do you read?

A       Rolling Stone magazine, John Grisham novels, James Patterson novels, Art Buchwald.

Q       Did you like Art Buchwald?

A       I haven't got into that book yet. It's While Regan Slept is the name of the book.

Q       Oh.

A       I have a book from Bob Woodward called the Secret Wars of the CIA I've been reading for a while. My eyes are getting really bad. I need glasses.

Q       Do you know what the last Grisham book was that you read?

A       I know the last James Patterson book that I read, Big Bad Wolf.

Q       What was it like?

A       It was pretty good.

(A.R. 36).

It was plaintiff's burden to submit medical evidence in support of his claim. *See Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Further, it was plaintiff's burden at step 3 of the sequential analysis to demonstrate that his impairment met or

equaled the requirements of listing 12.05.  *See Kyle v. Commissioner*, 609 F.3d at 855; *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).  The absence of a diagnosis of mental retardation by any treating or examining psychiatrist, psychologist, or physician during plaintiff's developmental period provides substantial evidence supporting the ALJ's finding that plaintiff did not meet or equal the requirements of 12.05(C) or any other subsection of this listing.  *See Hayes v. Commissioner*, 357 F. App'x at 676 (if the claimant cannot establish onset before age 22, he "cannot equal Listing 12.05"); *see also Anthony v. Astrue*, No. 09-3252, 2010 WL 4683955, at * 14 (C.D. Ill. Oct. 26, 2010); *Edwards v. Astrue*, No. 5:07-cv-898, 2010 WL 3701776, at * 4 (N.D.N.Y. Sept. 16, 2010).

Plaintiff's attorney referred him to Psychologist Richard King of Career and Clinical Consultants for an evaluation in support of his client's applications for DIB and SSI benefits.  (A.R. 455).  On June 10, 2009, plaintiff "drove himself to the evaluation session."[5]  (A.R. 455).  He arrived on time and presented himself in a cooperative manner.  He was able to follow directions and instructions with no observed difficulty.  (A.R. 455).  The history plaintiff supplied[6] was negative for drug and alcohol abuse:

> He reports no history of alcohol or other drug problems.  However, he then indicated that he had a drunk driving charge in 1997.  He reports that he does not experience any current

---

[5]Incredibly, the next day when the ALJ asked plaintiff about his driver's license, plaintiff testified: " I don't drive.  I just use it for an ID, Your Honor."  (A.R. 44).  When asked how long it had been since he had last driven at all, plaintiff replied:  "Like four years probably.  Four or five years."  (A.R. 44).

[6]Plaintiff did not provide King with his medical records from Dr. Duemler documenting his ongoing use of marijuana and alcohol.

emotional dysfunctions related to alcohol or other drug problems. He indicates, "I don't use anything now."

(A.R. 456). King administered the WAIS-III test and plaintiff achieved low test scores: a verbal IQ of 70, a performance IQ of 69, and a full scale IQ of 67. These scores placed plaintiff in the upper limits of the mentally retarded range." (A.R. 457). Further, King supplied opinions that plaintiff's limitations were "likely long term in nature" (A.R. 457) and that his capability for employment "would be very narrow and limited to simple and routine types of hands-on physical labor tasks." (A.R. 457). Plaintiff's reading test scores placed him at the second-grade level. (A.R. 457). King found that plaintiff's self-reporting suggested that he was "an individual who has significant emotional dysfunctions related to depression and anxiety, as well as mood dysfunctions. Mood swings are to be considered to be present as it relates to bipolar dynamics." (A.R. 457-58). King gave plaintiff a global assessment of functioning (GAF) score of 48. (A.R. 459). King also completed a Medical Assessment of Ability to Do Work Related Activities (Mental) questionnaire. In this document, King asserted that plaintiff had no ability to deal with the public or deal with work stresses. (A.R. 460). He rated plaintiff's ability to relate to co-workers, function independently, and maintain attention and concentration as "poor." (A.R. 460). He asserted that these deficits had been in effect for "at least 2 years." (A.R. 460). King stated that for "at least 2 years" plaintiff's ability to understand, remember and carry out complex job instructions and simple job instructions had been "poor." He stated that plaintiff had no ability to remember and carry out detailed, but not complex job instructions. (A.R. 461). For "at least 2 years" plaintiff had a "poor" ability to behave in an emotionally stable manner and relate predictably in social situations, and "no ability" to demonstrate reliability. (A.R. 461).

The ALJ found that the extreme restrictions suggested by Psychologist King were entitled to little weight:

> Claimant has had few intermittent complaints of depression (Ex. 16F)[A.R. 413-53], but the evidence does not document any one period of 12 continuous months of treatment for this (Exhibit 16F). However, in June 2009, claimant was diagnosed with bipolar disorder. This diagnosis is somewhat of a coincidence since there was no diagnosis of bipolar disorder in the medical record since October 2000. However, only two months before the hearing, this "medical problem" is suddenly brought to light by psychologists who have not seen the claimant before the June 10, 2009 evaluation (Ex 17F)[A.R. 455-61]. The claimant's psychological treatment in 1979 has no bearing on this case. He was 14 years old and he worked performing substantial gainful activity since that time.
>
> After careful consideration of the claimant's medical history as it relates to his . . . depression and bipolar disorder, the undersigned finds that these impairments do not meet the duration criteria for further evaluation.

(A.R. 16). Plaintiff's IQ tests results from his developmental period were normal. (A.R. 467, 470). The results of the IQ tests King administered almost 23 years after plaintiff had reached age 22 did not establish "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period." *See Foster*, 279 F.3d at 354-55; *Jones v. Commissioner*, No. 1:08-cv-562, 2009 WL 3498809, at * 4 (W.D. Mich. Oct. 26, 2009) ("[T]he great length of time separating the developmental period from the administration of the IQ test, tends to seriously undermine its probative value regarding [plaintiff's] condition over a decade earlier.") (Maloney, C.J.). The ALJ's finding that plaintiff did not meet or equal the requirements of listing 12.05(C) is supported by overwhelming evidence.

### 3.

Plaintiff argues that the ALJ committed reversible when he found that plaintiff did not have a severe mental impairment. (Plf. Brief at 10-12). The finding of a severe impairment at step 2 is a threshold determination. The finding of a single severe impairment is enough and requires

continuation of the sequential analysis. *See Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ found at step 2 of the sequential analysis that plaintiff had the severe impairment of "lumbar/cervical degenerative disc disease." (A.R. 15). The ALJ's failure to find additional severe impairments at step 2 is "legally irrelevant." *McGlothin v. Commissioner*, 299 F. App'x 516, 522 (6th Cir. 2009); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). The ALJ continued the sequential analysis and considered plaintiff's severe and non-severe impairments in making his factual finding regarding plaintiff's RFC. (A.R. 14-18).

Plaintiff disagrees with the ALJ's factual finding that his depression and bipolar disorder did not satisfy the durational requirement. (A.R. 12; Plf. Brief at 10). The social security regulations state: "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. §§ 404.1509, 416.909. Plaintiff did not receive treatment for any mental impairments during the period at issue: January 1, 2006 through September 24, 2009.

Plaintiff argues that Psychologist King "repeatedly indicated that Mr. Post's numerous deficits had been in effect for the last two years" and emphasizes that Dr. Duemler "noted mood disorders/psychological problems" on April 6, 2004, July 27, 2005, November 9, 2005, and May 8, 2009. (Plf. Brief at 10). These arguments do not provide a basis for disturbing the Commissioner's decision. On June 10, 2009, Psychologist King conducted his one-time evaluation. King gave no rational explanation for his repeated statements that plaintiff's deficits would have been in effect for "at least 2 years." King's unsupported conclusions were not entitled to any weight.

Dr. Duemler's progress notes reveal plaintiff's ongoing substance abuse problem. On April 6, 2004, plaintiff reported to Duemler that he was drinking alcohol on a daily basis and was

-19-

using illicit drugs.[7]  (A.R. 450-52).  On November 10, 2005, plaintiff stated that he "really wanted a break from work" and needed a note from Dr. Duemler.  (A.R. 437).  Plaintiff complained that he was experiencing a depressed mood because his girlfriend kicked him out and served him with papers.  He was having car problems.  He stated that he did not want to self-medicate with cocaine again because he hadn't done that for two years.  He stated that he had used LSD, mushrooms, and marijuana in his 20s, regularly used cocaine in his 30s, and continued to use illicit drugs in his 40s.  (A.R. 437).  Dr. Duemler gave plaintiff the "off work" slip he requested.  (A.R. 439).  On July 27, 2005, Dr. Duemler advised plaintiff to stop smoking, especially marijuana.  (A.R. 441).  In response to plaintiff's vague complaints of mood problems, Dr. Duemler discussed the possibility of a trial of Depakote.  (A.R. 441).

Plaintiff stopped working in December 2005.  There are no medical records showing that plaintiff required or received treatment for any mental impairment during the relevant time period on and after January 1, 2006.  On May 8, 2009, plaintiff returned to Dr. Duemler and reported that he had been in jail for 30 days.[8]  (A.R. 414).  He gave a history of smoking one-half pack of cigarettes per day for thirty years.  Plaintiff continued to smoke marijuana and occasionally use

---

[7]Since 1996, the Social Security Act, as amended, has precluded awards of DIB and SSI benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that his drug and alcohol abuse were not factors contributing to his disability.  *See Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether his drug and alcohol abuse were material to a finding of disability.

[8]Plaintiff is not eligible to receive social security benefits for any months he was confined in a jail, prison, or correctional facility.  42 U.S.C. § 402(x)(1)(A).

alcohol.  He wanted Dr. Duemler to provide him with a marijuana prescription.  (A.R. 414).  Dr. Duemler noted that plaintiff might have a bipolar or mood disorder.  (A.R. 415).  On June 2, 2009, Dr. Duemler recommended that plaintiff receive a psychiatric evaluation.  (A.R. 413).  Duemler's progress notes do not offer a diagnosis of any mental impairment, much less one meeting the durational requirement.  The ALJ's finding that plaintiff did not have any mental impairment that satisfied the twelve consecutive month durational requirement is supported by more than substantial evidence.

**4.**

Plaintiff argues that the ALJ did not meet his burden at step five of the sequential analysis because he failed to pose a hypothetical question to the VE including a restriction of working at eye level.  (Plf. Brief at 12-13).  This argument cannot withstand scrutiny.

The ALJ asked the VE a series of hypothetical questions.  The first hypothetical was based on Exhibit 14F, which restricted the hypothetical person to a limited range of light work.  The VE responded that there would be approximately 36,700 jobs in the region that the hypothetical person would be capable of performing.  (A.R. 93).  The next hypothetical question reduced the exertional level to work involving lifting no more than five pounds, no repetitive bending, and no cervical extension. (A.R. 95).  The VE testified that there would be 13,200 unskilled, sedentary jobs in the region that the hypothetical person would be capable of performing:  4,800 ticket seller, 4,900 bench assembler, and 3,500 parts checker jobs.  (A.R. 95).  The ALJ's third hypothetical was based on restrictions suggested by Dr. Kidwai.  (A.R. 95-96).  In response to this hypothetical, the VE testified that such an individual would be capable of performing all the unskilled sedentary jobs listed in response to the previous hypothetical question:

Q      Dr. Kidway addressed the restriction issue at several spots. One of those was at 4F16. I want to ask you some questions about his limits.  He states in this exhibit -- let me see.  I'm not sure he articulated those very well in that setting.  Let me see where he does that.  On page three of the 4F stack of exhibits he says that the Claimant should avoid frequent bending and twisting of the neck and/or shoulder girdle. He should avoid frequent bending and twisting of the low back.  He should do no prolonged sitting, standing, walking, stooping, or driving for more than a half an hour at a time. He suggests taking a few minutes break after each period of activity, and he advised against no prolonged flexed posture of the neck, and then he finally suggested no lifting of over 20 pounds.  It could be that he placed an x either next to or in the box of where it says should keep computer - at eye level.  If one were to adapt the limits that he states in that exhibit, how would that impact the jobs that you just gave me a moment ago, the sedentary jobs?

A      The only issue within that that I believe would have a serious impact on that would be where he indicated he should take a few minutes break after each period of activity.  Depending on what he means by a few minutes break certainly that could end up exceeding normal tolerances.

Q      What would be a level that in your opinion would exceed normal tolerances?

A      Well, it looks like he's talking about taking a break about every half-hour, and if that were to exceed more than say two to three minutes quite frankly and the person was going to have to be away from their station in some period of recuperation that was going to last five to ten minutes or something of that in nature then I don't believe it would be tolerated every half-hour.

Q      Okay.  And if it were where he remained at the workstation but simply sat down or ceased the activity for a couple of minutes then what would you likely see?

A      That would probably -- that would be acceptable.

(A.R. 95-99).  The VE's testimony in response to the follow-up questions asked by plaintiff's

attorney left no doubt that the jobs the VE had previously identified were performed at eye level:

Q      Secondly, you talked about some -- I believe they were all sedentary.  I believe all the jobs you postulated were sedentary.  If we were able to take into account just the neck at the moment -- and let's look at what Dr. Kidway said.  Dr. Kidway said avoidance of frequent bending and twisting of the neck and shoulder girdle.  Dr. Kidway is not really very articulate, as some physicians might be, but he is talking about essentially using the neck looking down, looking away, and that sort of thing. Doesn't that rule out some of those sedentary jobs?

-22-

A      No.  In my opinion they would not.  These are essentially jobs that are performed sort of at bench height.  The parts checker, the bench assembler that's going to be generally right in front of the individual.  The ticket taker is even more eye to eye if you will.

Q      How about -- Dr. Kidway -- although this man doesn't have any computer skills he did say that a computer or TV screen needed to be at his eye level.  Does that create a problem for any of these jobs?

A      No they shouldn't.

Q      There shouldn't be any computers or TV screens in any of these jobs?

A      No there wouldn't.  Well, the ticket seller certainly could in terms of not a TV screen but a monitor of sorts, but that would generally be at eye level.

(A.R. 101-03).  The ALJ's decision finding that plaintiff was not disabled at step 5 of the sequential analysis is supported by more than substantial evidence.

## **Recommended Disposition**

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:   September 26, 2011      /s/  Joseph G. Scoville
                             United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).